

FILED by _PG_ D.C.

OCT 11 2016

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. FLA. – MIAMI

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## CIVIL DIVISION

UNITED STATES OF AMERICA
*ex rel.*
GABRIEL VALLE, M.D. and
CARLOS BEJAR, M.D.

Relators

CASE NO. **16-24293**

**TO BE FILED IN CIV-LENARD
CAMERA AND
UNDER SEAL**

vs.

**DO NOT PUT IN PRESS BOX**

**DO NOT ENTER ON PACER**

RMS LIFELINE, INC.;
DAVITA, INC.;
and JOHN DOES 1-100

GOODMAN

Defendants.

## RELATORS' COMPLAINT UNDER
## THE FEDERAL FALSE CLAIMS ACT

Introduction ........................................................................................................... 3

Parties .................................................................................................................... 8

Jurisdiction and Venue .......................................................................................... 10

Federal Healthcare Programs ................................................................................ 11
    Introduction to the Medicare Program ............................................................ 11
    Introduction to Medicaid Program .................................................................. 12
    Other Federal Funded Health Care Programs ................................................ 13

The Law ................................................................................................................. 13
    The Federal Anti-Kickback Statute ................................................................ 13
    Joint Ventures and Other Physician Investments ........................................... 14
    Compliance with the Federal Anti-Kickback Statute is a Prerequisite to a
    Provider's Right to Receive and Retain Payments from Federal Healthcare
    Programs ........................................................................................................ 16

The Defendants' Scheme to Induce Referrals in Violation of the Anti-Kickback
Statute .................................................................................................................... 18
    Introduction to Kidney Disease and Medicare Coverage for Treatment of Such
    Disease .......................................................................................................... 18

**Introduction to Lifeline's National Business Model of Exploiting Investor Physicians for Referrals** ............................................................................. **18**

**Introduction to The Lifeline Vascular Access Center Ft. Lauderdale**.............. **20**

**Introduction to Lifeline's Inflated Projections of Profits to Induce Investor Physicians into Joint Ventures**............................................................... **25**

**The Early Stages of Establishing The Lifeline Vascular Access Center Ft. Lauderdale**................................................................................................ **27**

**Lifeline Engaged in Scheme of Constant Illegal Inducements to Pressure the Investor Physicians for Increased Referrals**........................................... **27**

**Defendants' Inducements for Referrals Are Not Sanctioned by any AKS Safe Harbor**........................................................................................................ **57**

**Count I--- False Claims Act 31 U.S.C. § 3729(a) (1)(A), Causing False Claims for Payment** ....................................................................................................... **58**

**Count II---False Claims Act 31 U.S.C. 3729(a)(1)(B), Use of False Statements**.................... **59**

**Count III---Federal False Claims Act 31 U.S.C. § 3729(a)(1)(C) Conspiring to Submit False Claims** ..................................................................................... **61**

**Count IV---Submission of Express and Implied False Certifications in Violation of 31 U.S.C. § 3729(a)(1)(B)**............................................................................ **62**

**Count V---Knowingly Causing and Retaining Overpayments in Violation of 31 U.S.C. § 3729(a)(1)(G)** ................................................................................... **63**

**Count VI---False Claims Act 31 U.S.C. 3729 (a)(1)(G) False Record to Avoid an Obligation to Refund** .................................................................................... **64**

**Prayers for Relief** ...................................................................................... **64**

## Introduction

1.      On behalf of the United States under the False Claims Act, Relators Gabriel Valle, M.D. and Carlos Bejar, M.D., state their Complaint against DaVita, Inc. and its wholly owned subsidiary, RMS Lifeline Inc. (collectively referred to as "Lifeline").

2.      In 2013, Dr. Valle and Dr. Bejar invested in a joint venture with Lifeline for the ownership and operation of a vascular access[1] center in Ft. Lauderdale, Florida. Since that time Dr. Valle and

_____

[1]  Vascular access makes hemodialysis treatments possible. Hemodialysis is a treatment for kidney failure that uses a machine to send the patient's blood through a filter, called a dialyzer, outside the body. The access is a surgically created vein used to remove and return blood during hemodialysis. The blood goes through a needle, a few ounces at a time. The blood then travels through a tube

Dr. Bejar have had extensive interactions and communications with Lifeline's national and regional executives concerning the operation of Lifeline vascular access centers.

3.      The facts stated in this Complaint are based on Relators' personal knowledge, their direct communications with Lifeline's national and regional executives, their receipt of emails from Lifeline's executives, their interactions with Lifeline's executives in the operation of vascular access centers, and their review of documents authored or compiled by Lifeline's executives.

4.      This is an action to recover statutory damages and civil penalties on behalf of the United States arising from false and/or fraudulent statements, records, and claims made or caused to be made by Lifeline and DaVita and/or their agents, employees, and co-conspirators in violation of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

5.      Under the False Claims Act, a private person may bring an action in federal district court for himself and the United States and may share in any recovery. That private person is known as a relator, and the action that the relator brings is called a *qui tam* action.

6.      On behalf of the United States, Relators bring this action against Lifeline and DaVita to recover moneys wrongfully billed to various government health care programs through the submission of false or fraudulent claims for payment.

7.      Lifeline has engaged in a national scheme to illegally induce physicians to refer patients to Lifeline-owned vascular centers.

8.      Lifeline owns and operates approximately 75 vascular centers throughout the United

---

that takes it to the dialyzer. Inside the dialyzer, the blood flows through thin fibers that filter out wastes and extra fluid. The machine returns the filtered blood to the body through a different tube. A vascular access lets large amounts of blood flow continuously during hemodialysis treatments to filter as much blood as possible per treatment. A vascular access should be in place weeks or months before the first hemodialysis treatment. Two types of vascular access designed for long-term use include the arteriovenous (AV) fistula and the AV graft. A third type of vascular access— the venous catheter—is for short-term use.

States. Relators have had extensive discussions and interactions with Lifeline's national executives, including its General Manager, its Director of Business Development, its Director of Marketing, and its Vice-President regarding the operations of Lifeline's vascular centers. Through the course of such interactions with Lifeline's national executives, Relators learned the national business model used by Lifeline to generate revenues.

9.      With respect to approximately 18 vascular access centers, Lifeline's primary business model has been joint ventures with investor physicians who are nephrologists. Lifeline has induced investor nephrologists to refer business to its facilities by: (a) luring them into joint ventures based on inflated projections of profits; (b) pressuring investor physicians for referrals of patients for high reimbursement procedures to boost revenues at the vascular centers; (c) systematic monitoring of referrals with regular promises of profit distributions or threats of financial losses to investor physicians as inducements for increased referrals; and (4) imposing capital calls and dilutions of interests for investor physicians who refuse to play the referral game with Lifeline, while rewarding the physicians who generate high volumes of referrals.

10.     At a conference call with Dr. Valle and Dr. Bejar and other investor physicians on February 11, 2016, Lifeline's national General Manager confirmed that Lifeline's network of vascular access centers owned with investor nephrologists "is tightly controlled and monitored" by Lifeline's national executives and "72% of the patients on average" from investor physicians' practices are treated at such access centers. Lifeline's national General Manager stated, "What I am saying is that in our network which is tightly controlled and monitored we see 72% of the patients on average."

11.     Lifeline's national General Manager also stated that under its joint venture model with investor physicians who refer on average 72% of their patients, the "return to practice" or

distribution to such physicians is "about $600,000" each year. On this conference call, Lifeline's General Manager stated, "I did not put on here but I probably should have at 72% our return to practice is about $600,000." "So if we [compare] our center to the average performance of output of a center per patient at 72% we see about $600,000 return to practice."

12.   These high profit distributions from high referrals by investor physicians are the result of Lifeline's national strategy of illegal inducements discussed in detail below.

13.   Lifeline's tactics are not only deliberate violations of the Anti-Kickback Statute; they are detrimental to patient care.

14.   The Medicare Program insures the vast majority of patients targeted by Lifeline for referrals.

15.   Lifeline has repeatedly and deliberately violated the federal Anti-Kickback Statute ("AKS"), 42 U.S.C. 1320a-7b(b), in its business model of exploiting joint ventures with physicians for referrals.  The AKS is designed to insure that physicians make clinical decisions based upon informed, impartial medical judgment---judgment unaffected by personal financial motives. Lifeline has knowingly and routinely violated that fundamental principle---corrupting the medical judgment of physicians by implementing a scheme of aggressive economic pressure for referrals on physician investors in joint ventures.

16.   The Anti-Kickback Statute prohibits a healthcare provider from offering or paying "any remuneration…directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to…refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program."  42 U.S.C. § 1320a-7b(b). As discussed in detail below, Lifeline has designed and implemented business strategies to exploit joint ventures with physicians in deliberate violation of

the Anti-Kickback Statute.

17.    Claims submitted by Lifeline or the physicians tainted by these illegal kickbacks are ineligible for reimbursement by the Medicare Program, Medicaid Program, or other federal-funded health care programs.

18.    This *qui tam* case is brought against Lifeline for knowingly defrauding the federal government in connection with the Medicare, Medicaid, Tri-Care, and other federally funded health care programs.

19.    Lifeline's conduct detailed in this Complaint violates the federal False Claims Act. The False Claims Act was originally enacted during the Civil War. Congress amended the Act in 1986---and again in 2009---to enhance the ability of the United States Government to recover losses as a result of fraud against it. Congress amended the Act after finding that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

20.    The False Claims Act prohibits: (a) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; and (c) conspiring to violate any of these provisions. 31 U.S.C. § 3729 (a)(1)(A)-(C).  Any person who violates the False Claims Act is liable for a civil penalty of up to $11,000 for each violation, plus three times the amount of damages sustained by the United States. 31 U.S.C. § 3729 (a)(1).

21.     The False Claims Act allows any person having information about an FCA violation to

bring an action on behalf of the United States, and to share in any recovery. The FCA requires that

the Complaint be filed under seal for a minimum of 60 days (without service on the defendants

during that time) to allow the government time to conduct its own investigation and to determine

whether to join the suit.

22.     Under the federal False Claims Act, on behalf of the United States, Relators seek to recover

all available damages, civil penalties, and other relief arising from Lifeline's conduct described in

this Complaint.

## Parties

23.     Relator Gabriel Valle, M.D. is a nephrologist practicing in Ft. Lauderdale, Florida and a

member of The Kidney & Hypertension Group of South Florida. Dr. Valle completed his medical

training at the University of Miami Miller School of Medicine. He also completed both a research

and clinical Fellowship in Nephrology at the University of Miami Miller School of Medicine. He

is Board Certified in both Internal Medicine and Nephrology and is also certified as a specialist in

Hypertension by The American Society of Hypertension. He is a Fellow of the American College

of Physicians, a Fellow of the American Society of Chest Physicians, a Fellow of the American

Society of Nephrology, and a Fellow of the American Society of Hypertension. Dr. Valle is an

Affiliated Professor, Department of Medicine and Nephrology Subspecialty Education

Coordinator, University of Miami Miller School of Medicine at Holy Cross Hospital Internal

Medicine Residency Program. He also serves as Associate Medical Director, Peritoneal Dialysis

Program at DaVita's Fort Lauderdale Dixie Dialysis.

24.     Relator Carlos Bejar, M.D. is also a nephrologist practicing in Ft. Lauderdale, Florida and

a member of The Kidney & Hypertension Group of South Florida. Dr. Bejar completed his medical training and Fellowship at the Cleveland Clinic Ohio and is a former Director of Nephrology at the Cleveland Clinic Florida. He is Board Certified in both Internal Medicine and Nephrology and certified as a Specialist in Hypertension by the American Society of Hypertension. Dr. Bejar is also an Affiliated Professor, Department of Medicine, University of Miami Miller School of Medicine at Holy Cross Hospital Internal Medicine Residency Program.

25.    Both Dr. Valle and Dr. Bejar have been investors into a joint venture with Lifeline for the operation of Lifeline Vascular Access Center Fort Lauderdale.

26.    Defendant DaVita, Inc. is a Delaware corporation with its corporate headquarters located at 1551 Wewatta Street, Denver Colorado 80202.

27.    According to its most recent annual report, DaVita is a leading provider of dialysis services for patients suffering from chronic kidney failure or end-stage renal disease ("ESRD"). As of December 31, 2015, DaVita Kidney Care, a division of DaVita Healthcare Partners, operated or provided administrative services at 2,251 outpatient dialysis centers located in 46 states and the District of Columbia, serving approximately 180,00 patients each year. DaVita has also provided acute inpatient dialysis services in approximately 900 hospitals and related laboratory services.

28.    Defendant Lifeline is a DaVita subsidiary that operates approximately 75 vascular access centers in 24 states and the District of Columbia. Lifeline owns most of these 75 vascular access centers with investor physicians under joint venture agreements. According to DaVita's website, "Lifeline Vascular Access is the nation's largest network of freestanding vascular centers focused on caring for the needs of kidney patients."

29.    The identities of the remaining Doe defendants who knowingly submitted or caused the submission of false claims to the United States are presently unknown to Relators.   All listed

Defendants and such additional Doe defendants have served as contractors, agents, partners, and/or representatives of one and another in the submission of false claims to the United States and were acting within the course, scope and authority of such contract, conspiracy, agency, partnership and/or representation for the conduct described below.

## **Jurisdiction and Venue**

30.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. §§ 3729 and 3730.

31.  Personal jurisdiction and venue are proper in this District under 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), as Defendants can be found, reside, transact business, or otherwise engaged in the illegal conduct at issue within the District.

32.  This action arises under the provisions of Title 31 U.S.C. § 3729, *et seq*, popularly known as the False Claims Act which provides that the United States District Courts shall have exclusive jurisdiction over actions brought under that Act.

33.  Section 3732(a) of the Federal False Claims Act provides, "Any action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred."

34.  Relators have complied with 31 U.S.C. §3730(b)(2) by serving a copy of the Complaint and their written disclosure of substantially all material evidence and information in their possession upon the United States Attorney for the Southern District of Florida and the United States Attorney General.

35.     In addition, Relators, through their counsel, communicated in writing with agents of the Department of Justice and provided them with relevant information as set forth in this Complaint prior to any public disclosure in this matter and prior to filing this suit.

### Federal Healthcare Programs
### Introduction to the Medicare Program

36.     Federal Healthcare Programs include patients covered under the Medicare, Medicaid, and TRICARE Programs discussed below in addition to federal employees and retired federal employees.

37.     Medicare is a federally funded health insurance program primarily benefitting the elderly. In 1965, Congress enacted Title XVIII of the Social Security Act (Medicare) to pay for the cost of certain medical services for persons aged 65 years or older and those with disabilities.

38.     The Medicare Program has four parts. Part A, Part B, Part C, and Part D. Medicare Part A, the Basic Plan of Hospital Insurance, covers the cost of inpatient hospital services and post-hospital nursing facility care. Medicare Part B, the Voluntary Supplemental Insurance Plan, covers the costs of services performed by physicians and certain other health care providers, both inpatient and outpatient, if the services are medically necessary and directly and personally provided by the provider. Medicare Part C covers certain managed care plans, and Medicare Part D provides subsidized prescription drug coverage for Medicare beneficiaries.

39.     Medicare provides benefits for patients with End Stage Renal Disease under Parts A and B.

40.     Medicare pays providers only for services that it considers "reasonable and necessary for the diagnosis or treatment of illness or injury." Social Security Act § 1862 (a)(1)(A).  Providers

who wish to participate in the Medicare Program must ensure that their services are provided "economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a).

41. HHS is responsible for the administration and supervision of the Medicare Program. CMS is an agency of HHS and is directly responsible for the administration of the Medicare Program.

42. Lifeline and DaVita have each executed at least one provider agreement with CMS in which they agreed to abide by the Medicare laws, regulations and program instructions…" CMS Provider/Supplier Enrollment Application Forms 855-A and 855-B. DaVita and Lifeline expressly certified their understanding "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulation and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law)…" *Id.*

### Introduction to Medicaid Program

43. Medicaid was also created in 1965 under Title XIX of the Social Security Act. Complaint. Funding for Medicaid is shared between the federal Government and those states participating in the Program. Thus, under Title XIX of the Social Security Act, 42 U.S.C § 1396, *et seq.*, federal money is distributed to the states, which in turn provide certain medical services to the poor.

44. Federal Medicaid regulations require each state to designate a single state agency responsible for the Medicaid Program. The agency must create and implement a "plan for medical assistance" that is consistent with Title XIX and with the regulations of the Secretary of HHS ("the Secretary"). After the Secretary approves the plan submitted by the state, the state is entitled each quarter to be reimbursed for a percentage of its expenditures made in providing specific types of medical assistance under the plan. 42 U.S.C. § 1396b(a)(1).

45. Individuals may be "dual eligible" for both the Medicare Program (as the primary insurer) and the Medicaid program (as the secondary insurer).

## Other Federal Funded Health Care Programs

46.     The federal Government administers other health care programs including, but not limited to, TRICARE, CHAMPVA, and the Federal Employee Health Benefit Program.

47.     TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces.

48.     CHAMPVA, administered by the United States Department of Veterans Affairs, is a health care program for the families of veterans with 100 percent service-connected disability.

49.     The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and survivors.

## The Law
## The Federal Anti-Kickback Statute

50.     The Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), arose out of Congressional concern that kickbacks to those who can influence health care decisions would result in goods and services being provided that are medically unnecessary, too costly, of poor quality or even harmful to a vulnerable patient population.

51.     The Anti-Kickback statute was based in part on studies demonstrating that physicians, even those intending to act in good faith, were likely to refer significantly more patients when there was a financial incentive to generate business. The Anti-Kickback Statute arose out of congressional concern that kickbacks given to those who can influence healthcare decisions corrupt medical decision-making.

52.     To protect the integrity of federal health care programs, and realizing the difficulty of

regulators and law enforcement to review every case for medically unnecessary procedures, Congress enacted a *per se* prohibition against kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care.

53.     First enacted in 1972, Congress strengthened the statute in 1977 and in 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Anti-fraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

54.     The Anti-Kickback Statute prohibits a healthcare provider from offering or paying "any remuneration…directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to…refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b).

55.     The OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952, 35958 (1991) broadly define the term "remuneration" as "anything of value in any form whatsoever."

56.     In addition to the more obvious types of remuneration (e.g. cash payments, gifts of cars, free vacations, etc.), the statute also prohibits less direct forms of payment such as investment arrangements in which a joint venture incentivizes investing physicians for referrals or promises lucrative distributions of profits based on increased referrals.

### Joint Ventures and Other Physician Investments

57.     The Department of Health and Human Services ("HHS") Office of Inspector General ("OIG") is responsible for issuing regulations and guidance interpreting the AKS. The OIG has expressed particular concern with joint ventures and other investment arrangements when a

14

referring physician owns part of any entity to which she or he refers patients.

58.     In its national business strategy, Lifeline has ignored OIG's concerns and deliberately implemented strategies to exploit investor physicians for referrals. As discussed below, Lifeline's national business model is to illegally induce investor physicians to refer patients to Lifeline's vascular access centers.

59.     The HHS OIG has issued regulations defining certain "safe harbors" to potentially permit certain types of financial relationships that would be otherwise prohibited by the AKS. The burden is on the party seeking to benefit from the safe harbor to demonstrate that the transaction falls within the protection of the safe harbor.

60.     One such safe harbor covers certain situations in which a physician is an investor in a dialysis center or vascular center or other business to which that physician makes referrals or otherwise recommends to patients. *See* 42 C.F.R. § 1001.952. Ordinarily, any money a physician received as a result of his or her investment in the vascular center---such as regular distribution of profits---could constitute illegal remuneration under the AKS.

61.     The "safe harbor" is narrowly tailored to prevent improper economic inducements from being disguised as legitimate investment mechanisms. As OIG explained: "With respect to joint ventures, the major concern is that profit distributions to investors in the joint venture, who are also referral sources to the joint venture, may potentially represent remuneration for those referrals." HHS OIG Advisory Opinion 97-5, at 7 (October 6, 1997).

62.     An entity whose activity otherwise could be covered by the broad, remedial language of the AKS is exempted from liability through the "safe harbor" only if that entity's investment interests and conduct meet all of the applicable standards set forth in the regulations. 42 C.F.R. § 1001.952(a). Three of those requirements particularly relevant to this case include the following:

- "No more than 40 percent of the value of the investment interests of each class of investment interests may be held in the previous fiscal year or previous 12 month period by investors who are in a position to make or influence referrals to, furnish item or services to, or otherwise generate business for the entity;" and

- "No more than 40 percent of the entity's gross revenue related to the furnishing of health care items and services in the previous fiscal year or previous 12-month period may come from referrals or business otherwise generated from investors;" and

- "The terms on which an investment interest is offered to an investor who is in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity must not be related to the previous or expected volume of referrals, items or services furnished, or the amount of business otherwise generated from that investor to the entity."

*See* 42 C.F.R. § 1001.952(a)(2)(i), (iii), (vi), (viii).

63.     As discussed below, in its Lifeline's business model with investor physicians, Lifeline has disregarded the requirements of this safe harbor.

**Compliance with the Federal Anti-Kickback Statute is a Prerequisite to a Provider's Right to Receive and Retain Payments from Federal Healthcare Programs**

64.     Compliance with the Anti-Kickback Statute is a precondition of participation as a healthcare provider in federal-funded healthcare programs.

65.     Compliance with the Anti-Kickback Statute is a mandatory material condition of payment by the Medicare Program and the Medicaid Program. *See* 42 U.S.C. § 1320a-7b (b).

66.     Lifeline and DaVita have each executed at least one provider agreement with CMS in which they agreed to abide by the Medicare laws, regulations and program instructions…" CMS

Provider/Supplier Enrollment Application Forms 855-A and 855-B.  Lifeline expressly certified its understanding "that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulation and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law)…" *Id.*

67.     The Medicare claim form for payments contains a certification by the provider that the provider has complied with all aspects of the Medicare Program, including compliance with federal laws.

68.     Violation of the Anti-Kickback Statute may subject the perpetrator to exclusion from participation in Federal Healthcare Programs, civil monetary penalties of $50,000 per violation, and three times the amount of remuneration paid, regardless of whether any part of the remuneration is for a legitimate purpose. 42 U.S.C. § 1320-7(b) (7) and 42 U.S.C. § 1320a-7a (a) (7).

69.     Any party convicted under the AKS must be excluded from federal healthcare programs for a term of at least five years. 42 U.S.C § 1320a-7(a)(1).  Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the statute, the Secretary may exclude that provider from federal healthcare programs for a discretionary period and may consider imposing administrative sanctions of $50,000 per kickback violation. 42 U.S.C. § 1320a-7(b).

70.     Thus, compliance with the Anti-Kickback statute is a prerequisite to a provider's right to receive or retain payments from Medicare, Medicaid and other federal healthcare programs. Similarly, compliance with the federal AKS and comparable state anti-kickback statutes is a prerequisite to a provider's right to receive or retain payments from state-funded healthcare programs.

71.     Claims for payment for services tainted by kickbacks prohibited by the AKS are false or

fraudulent under the False Claims Act because providers of such services are ineligible to participate in government healthcare programs, and the government would not have paid such claims had it known of the kickbacks. *See* 31 U.S.C. §§ 3729(a) & (b); 42 U.S.C. §§ 1320a-7b(b), (f) & (g).

### The Defendants' Scheme to Induce Referrals in Violation of the Anti-Kickback Statute

#### Introduction to Kidney Disease and Medicare Coverage for Treatment of Such Disease

72.    By way of introduction, chronic kidney disease is a progressive disease that ultimately destroys the kidney's ability to process and clean blood.  The loss of kidney function is normally irreversible. End Stage Renal Disease ("ESRD") is the stage of advanced kidney impairment that requires continued dialysis treatments or a kidney transplant to sustain life. Dialysis is the removal of toxins, fluids and salt from the blood of ESRD patients by artificial means.

73.    Patients suffering from ESRD generally require dialysis at least three times per week for the rest of their lives. There are more than 345,000 ESRD dialysis patients in the United States.

74.    Since 1972, the federal government has provided universal payment coverage for dialysis treatments under the Medicare ESRD program regardless of age or financial circumstances. Under this system, Congress establishes Medicare rates for dialysis treatments, related supplies, lab tests, and medications. Other Government-funded healthcare programs and private insurance plans also routinely provide coverage for dialysis, either separately or in combination with a patient's Medicare coverage.

#### Introduction to Lifeline's National Business Model of Exploiting Investor Physicians for Referrals

75.    DaVita's and Lifeline's business model is fundamentally dependent on their relationships

with physicians who refer patients to their dialysis and vascular centers---especially their relationships with the key physicians who are responsible for a major share of all patients who are treated at the centers.

76.     Lifeline operates approximately 18 vascular centers under joint ventures with investor nephrologists.

77.     Rather than working to generate business by simply demonstrating superior quality of clinical services and patient care, Lifeline intentionally uses illegal kickbacks within joint ventures to obtain and increase referrals.

78.     One part of Lifeline's strategy for boosting profits has targeted increased screening and treatment of kidney patients for peripheral artery disease (PAD). As stated on DaVita's website, "A growing number of our outpatient centers offer procedures targeted at the diagnosis and treatment of Peripheral Arterial Disease (PAD)." The reason for Lifeline's focus on PAD is profits---higher payment rates from the Medicare Program and other payers. The average payments for screening and treating PAD are roughly five times higher than the average payments for dialysis-related vascular access procedures.

79.     Lifeline's executives provided data to Dr. Valle and Dr. Bejar that showed between 2010 and 2014, the number of patients treated for PAD at Lifeline's vascular access centers in the United States grew from 585 patients in 2010 to 3,196 patients in 2014.  Lifeline achieved this significant growth in PAD procedures at the expense of compliance with the Anti-Kickback Statute.

80.     In 2014, approximately 57.6 percent of these PAD patients at Lifeline vascular centers underwent atherectomy procedures, approximately 22.2 percent underwent angioplasty, 11.6 percent underwent stent placement, and approximately 8.5 percent underwent angiogram. Lifeline's scheme has led to thousands of patients undergoing surgical procedures for treatment of

PAD and the vast majority of these procedures were billed to and paid by the Medicare Program.

81.　　In each recent fiscal quarter, Lifeline has performed approximately 32,000 procedures on patients ---most of whom were covered by the Medicare Program. Lifeline's executives provided data to Dr. Valle and Dr. Bejar that indicated Lifeline performed 32,309 procedures nationally in the third quarter of 2015, of which 815 of these procedures were for PAD treatment.

82.　　In the first quarter of 2016, Lifeline performed 31,486 procedures nationally, of which 768 procedures were for PAD treatment.

83.　　Lifeline's major growth in operations and procedures has been achieved at the expense of compliance with the Anti-Kickback Statute.

### Introduction to The Lifeline Vascular Access Center Ft. Lauderdale

84.　　In or about 2006, Lifeline's executives organized a meeting with local nephrologists in Ft. Lauderdale, Florida to discuss the creation of a vascular access center.

85.　　The premise for the center was to address vascular access problems in the dialysis patient population from multiple nephrology practices.

86.　　Relators Dr. Valle and Dr. Bejar are members of the The Kidney Group. The Kidney Group was involved in the early stages of the discussions with Lifeline. Due to restrictions imposed by its former joint venture dialysis business partner (KRU Medical Ventures), The Kidney Group walked away from the negotiations and remained on the sidelines.

87.　　The original nephrologists interested in the business model proposed by Lifeline included: Dr. Alberto Casaretto, Dr. Robert Cueli, Dr. Mark Kaylin, and Dr. Jorge Barrero, each of them representing separate nephrology practices.

88.　　The original business model evolved from Lifeline offering exclusively management services within a 100% physician owned vascular access center to Lifeline becoming a shareholder

in a joint venture partnership with physician investors. The center was called Lifeline Vascular Center Ft. Lauderdale (sometimes referred to as "the Center").

89.    In late 2010, Lifeline's Director of Business Development, Adrian Amedia, made a presentation to the potential investor physicians in Ft. Lauderdale.  The presentation included a slide show with representations discussed below.

90.    At that time Lifetime managed vascular centers in approximately 18 states.

91.    In this presentation, Amedia touted the services of Lifeline in managing these centers. He represented that Lifeline's business model was to provide management services only with no ownership in vascular centers. One slide represented that Lifeline's management fee was "all inclusive and cover[ed] the following services: long-term debt financing, short-term debt financing, accounting, accounts payable, coding, billing and collections, clinical education, community outreach, compliance, equipment leasing, staff employment, supply management and pricing, human resource, recruiting, information services, licensure, payor contracting, purchasing, policy and procedures, and quality management."

92.    Amedia also presented a slide that stated, "Lifeline has created a contracting entity to contract with national and larger regional payors." "Lifeline managed centers meeting network physical service, and quality parameters are invited to join." "Contracted payors will direct managed care patients to network facilities."

93.    In this presentation, Lifeline's Director of Business Development originally led the investor physicians to believe that a vascular access center managed by Lifeline would receive a stream of patients from managed care patients insured by national and large regional payors.

94.    In this presentation, Amedia also presented a slide that showed that profits at a vascular center would increase based on the volume of hemodialysis patients. With 600 patients, profits

21

would be $1,000,000 per year. With 1000 patients, profits would rise to $3,000,000 per year. And with 1200 patients, profits would increase to $4,000,000 per year.

95.    Another slide stated that the physicians would own the vascular access center: "Multiple practices create a new practice to own the access center and employ interventionists through the new practice." Under Lifeline's proposal, Lifeline would not have an ownership interest in the center. Instead, Lifeline would only provide management services.

96.    In this presentation, Lifeline's Director of Business Development provided the investor physicians with numerous pro forma financials. In each pro forma, Lifeline represented that its total management fee would be 8.5% of net revenue.

97.    The pro forma provided by Lifeline represented that with approximately 1200 patients seen each year at the vascular access center, the physician investors would receive between $436,564 and $488,315 each year over the following 5 years.  With approximately 1700 patients each year, Lifeline's Director of Business Development represented that the physician investors would receive between $982,987 and $1,081,005 each year over the following 5 years.

98.    Dr. Valle and Dr. Bejar were interested in establishing a vascular access center because such centers can help patients avoid hospitalizations for dialysis care. Such centers generally provide quicker access to dialysis treatment for patients with kidney failure. Many of their patients needed hemodialysis----the most often used treatment for end-stage renal disease (ESRD), more commonly known as kidney failure.[2]

---

[2] During a hemodialysis treatment, a machine pumps blood from the patient's body by way of a flexible, plastic tube, cleans it and then returns it to the body through a separate tube. To perform hemodialysis, an access must be created. An access is a site from which blood can be safely removed and returned to the body. The first step is establishing dialysis access one of four ways:  (1) A tunneled catheter in the neck, (2) an AV fistula—taking a piece of a vein from your arm or leg and sewing it into a nearby artery, and allowing the sewn-in vein to enlarge and become thicker,

99.    When the opportunity to be involved in the vascular access center came up, Dr. Valle and

Dr. Bejar believed it would be an important option for their dialysis patients. All hemodialysis

patients need an access. Sometimes it's a temporary access placed in the chest called a Tesio

catheter but this access is not used long-term because it is prone to infection. The preferred method

is a vascular access that is called a fistula---the connection of an artery to a vein. Sometimes when

the vasculature is not optimal, an artificial material is used to create an access in the arm called a

graft.

100.   Dialysis access is literally the patients' lifeline. When the access presents problems it's

most often when the patient arrives for dialysis and the nurse would find the access was clotted or

nonfunctioning or sluggish and the blood flow needed to complete the dialysis was not achievable.

If it was clotted or the blood flow was slow, Dr. Valle and Dr. Bejar would send the patient that

very day to a radiologist to repair the problem. In the case when it could not be repaired simply,

then the radiologist would place a temporary catheter ---the Tesio catheter----so the patient could

return to the dialysis center and receive dialysis that day. The goal was to get the dialysis patient

back to the center before it closed. If this was not possible, then Dr. Valle and Dr. Bejar were

forced to decide whether the patient could wait until the center opened the next day or whether the

patient needed to be hospitalized. Hospitals and Medicare both frown on this type of admission.

101.   Originally, Dr. Valle and Dr. Bejar were interested in the joint venture for the vascular

access center because they believed that the center could provide important services for dialysis

---

like an artery, (3) An AV graft—the sewing of a prosthetic graft between an artery
and vein in the arm or leg, or (4) peritoneal dialysis—placement of a small tube,
called a cannula, in the abdomen to allow the use of the lining of the abdomen
(peritoneum) to filter blood. Patients receiving dialysis can encounter a range of
complications requiring immediate medical care more readily available at
outpatient vascular access centers rather than hospitals.

access and would be a solid investment based on Lifeline's projections.

102.   Sometime in 2012, Lifeline changed its business strategy and decided to enter into a joint venture with the investor physicians under which Lifeline would hold a 51% ownership interest in the Vascular Access Center Ft. Lauderdale.

103.   In 2012, the various physician groups represented by Dr. Alberto Casaretto, Dr. Robert Cueli, Dr. Mark Kaylin, and Dr. Jorge Barrero were organized as South Florida Vascular Solutions. On June 1, 2012, South Florida Vascular Solutions entered into the Operating Agreement with RMS Lifeline, Inc. and Las Olas De Sequoia, LLC, the name of the joint venture.

104.   Under the Operating Agreement, South Florida Vascular Solutions owned 49% of the new joint venture while Lifeline's ownership share was 51%.   (*See* Operating Agreement, Ex. C). Under the Operating Agreement, South Florida Vascular Solutions would make a capital contribution of $800,170 to the joint venture and Lifeline would contribute $832,830. *Id.*

105.   The joint venture was formed "for the purpose of (a) acquiring, developing, establishing, owning or leasing, and operating one or more Access Services centers…and (b) for the purpose of doing such things as are necessary, convenient, desirable or incidental to the foregoing, and for such other purposes as may be agreed upon from time to time by a Majority of the Members."

106.   The joint venture was formed for the purpose of establishing a vascular access center for patients with kidney failure to receive dialysis treatment. Nevertheless, in pursuit of higher profits, Lifeline would later expand the Center's operations to include vascular surgical procedures discussed below.

107.   Lifeline also contracted to provide management services to this joint venture.  Lifeline would be paid a management fee plus Lifeline would share in profit distribution in proportion to its ownership interest of 51%.

108.   The Management Services Agreement signed by Lifeline recognizes federal laws prohibiting inducements for referrals. (*See* Management Services Agreement, Par. 2.4 and Par. 10).

109.   Section 6.2 of the Joint Venture Operating Agreement gave Lifeline the right to cause the joint venture to borrow additional funds or require each member to contribute additional capital. If a member fails to make additional capital contributions as required by Lifeline, its percentage interest in the joint venture is diluted.

110.   Section 19.10 of the Operating Agreement provides that if Lifeline guarantees an obligation of the joint venture, it is entitled to a pro rata contribution from each member.

111.   In late 2012, as a result of the purchase of KRU Medical Ventures by DaVita, The Kidney Group no longer had restrictions from that partnership and Dr. Valle and Dr. Bejar decided to explore the option of joining South Florida Vascular Solutions as part of the joint venture.

**Introduction to Lifeline's Inflated Projections of Profits to Induce Investor Physicians into Joint Ventures**

112.   On January 28, 2013, Randy Longman, the National Director of Business Development at Lifeline, provided Dr. Valle with a pro forma of projected expenses and revenues for the joint venture. This pro forma provided estimated profits to the joint venture based on the volume of patients referred to the Center. Mr. Longman copied James Spafford, Lifeline's Regional Operations Manager, with this email and the pro formas.

113.   The pro forma presented by Lifeline's National Director of Business Development listed different levels of profits to the joint venture based on different volumes of patient referrals to the Center. If 650 patients with end stage renal disease were referred to the Center each year, then the joint venture would profit $959,274 in year 1, $951,764 in year 2, $1,449,006 in year 3, $992,603

in year 4, and $1,012,245 in year 5.

114.   The pro forma presented by Lifeline's National Director of Business Development represented that if 800 patients with end stage renal disease were referred to the Center each year, then the joint venture would profit $1,072,515 in year 1, $1,094,557 in year 2, $1,139,430 in year 3, $1,185,649 in year 4, and $1,233,255 in year 5.

115.   The pro forma presented by Lifeline's National Director of Business Development represented that if 900 patients with end stage renal disease were referred to the Center each year, then the joint venture would profit $1,241,442 in year 1, $1,260,605 in year 2, $1,311,200 in year 3, $1,363,312 in year 4, and $1,416,988 in year 5.

116.   The projections of profits presented by Lifeline's National Director of Business Development were deliberately inflated to induce the investor physicians to join the joint venture.

117.   The projections by Lifeline included a fixed number of patients each year (340) for treatment of peripheral artery disease ("PAD").

118.   All of these financial representations of increasing profits to distribute to the investor physicians were primarily based on the increasing volumes of referrals of patients with end stage renal disease. The increased financial projections were not based on increased procedures to treat PAD. Rather Lifeline represented that the investor physicians would receive increased profits in proportion to the volume of patients referred for end stage renal disease.

119.   In this pro forma used by Lifeline to induce the Kidney Group to join the joint venture, Lifeline deliberately overstated the amount of revenues per patient encounter and deliberately understated the management fees that Lifeline would receive.

120.   Lifeline's National Director of Business Development sent a clear message to the investor physicians that if they referred higher volumes of patients to the Center, they would receive higher

payments through the joint venture.

### The Early Stages of Establishing The Lifeline Vascular Access Center Ft. Lauderdale

121.   In early 2013, South Florida Vascular Solutions amended its Operating Agreement to include The Kidney Group as 25% owners. The rest was divided as follows by practice group: Dr. Casaretto *et al* 40%, Dr. Cueli 15%, Dr. Barrero *et al* 15% and Dr. Kaylin 5%.

122.   In 2013 and 2014, South Florida Vascular Solutions made capital contributions in the amount of $800,170 to the joint venture in accordance with Exhibit C of the Operating Agreement. Of such total amount, 30% or $240,051 was paid upon execution of the lease for the commercial space to operate the Center, 30% or $240,051 was paid approximately 60 days after construction started, 30% or $240,051 was paid approximately 60 days thereafter or January 17, 2014, and 10% or $80,017 was paid within 14 days of the certificate of occupancy.

123.   In December of 2013 prior to the Center starting operations, Aaron Luther, Vice President of Operations at Lifeline, sent an email to all physician investors with a copy of the Lifeline standing order sheet "for use at your dialysis centers." The sheet was titled "Indications for Patient Referral to Lifeline Vascular Center---Ft. Lauderdale." The sheet also stated: "The purpose of this protocol is to establish a physician-specific standard practice for the referral of patients to Lifeline Vascular Center---Ft. Lauderdale." The sheet listed 15 reasons for referrals. There was no mention of PAD screening or PAD procedures as the original premise of the joint venture was to provide vascular access care to dialysis patients.

### Lifeline Engaged in Scheme of Constant Illegal Inducements to Pressure the Investor Physicians for Increased Referrals

124.   The Center started providing patient care in February of 2014.

125.   As the initial year of operations evolved, Lifeline closely monitored and pressured the

27

investor physicians for more referrals. The investor physicians exceeded Lifeline's projections of referral volume, yet the Center was not profitable according to Lifeline's accounting.

126.   On September 25, 2014, Lifeline conducted an "investor meeting" with the physicians and circulated a slide presentation. Richard Nee, Lifeline's General Manager, and Lisa Gdowski, Lifeline's Marketing Manager, also attended this meeting.

127.   Steve Flieder, Lifeline's Vice-President, presented the slides to the investor physicians. The opening slide stated, "What you can do about improving our results…" One slide listed year-to-date financial results and stated "Results are far below our budgeted plan." Flieder presented detailed data regarding the numbers of "patient encounters" and the average revenues per patient encounter at the Center.

128.   For the year-to-date, the average revenues per patient encounter were $533 under budget. The number of patient visits was 51 under budget.

129.   Flieder provided another slide that tracked the numbers of referrals by each investor physician to the Center for the time period of April-June 2014.  Leading the list of physicians with the highest number of referrals to the Center were Dr. Barrero, Dr. Cueli, and Dr. Casaretto.

130.   On the day after the September 25, 2014 investor meeting, Flieder sent an email to Richard Nee and Lisa Gdowski in which he thanked them for attending the meeting. He also stated, "Good news is the docs were all 'fired' up last night---and sharing our quality metrics & numbers (financials as well as pt volumes) has them competing with each other and focused on taking care of ALL their patients here at the center." Flieder further stated, "I don't see any reason why we can't send the weekly summary of the attached to the investor team---my only concern is I need to make sure file is securely sent due to PHI [protected health information]."

131.   The weekly summary referenced by Flieder was the spreadsheet tracking every patient

referred by the investor physicians. Lifeline regularly sent this weekly summary to pressure physicians for continuing and increased referrals and to entice the physicians to compete with each other for the highest volume of referrals and the highest value of referrals.

132.   After the September 25, 2014 investor meeting, Lifeline sent weekly spreadsheets to the investor physicians that listed the volumes of their referrals to the Center.

133.   On September 29, 2014, Flieder sent another email to the investor physicians that listed the names of the patients seen in the Center "last week," the procedures performed on each patient, and the names of the investor physician who referred each patient. Flieder copied Richard Nee, Lifeline's National General Manager.

134.   On September 30, 2014, Flieder send an email to the investor physicians with an "action plan." He began by placing financial pressure on the physicians with projections contrary to all of the projections Lifeline provided prior to the launch of the Center: "Unfortunately, 2014 will be a significant financial loss and the preliminary budget for 2015 shows an (unimpressive) breakeven result."

135.   He then stated, "We must work together to continue to ramp up volumes for care of your patients in order to significantly improve our financial results."

136.   Flieder further stated in his email, "PAD continues to do well, please continue to provide PAD risk assessments for your patients; we will continue to perform them for ALL patients coming to the access center…" Lifeline repeatedly instructed the investor physicians to conduct PAD risk assessments for all of their patients despite the fact the investor physicians did not treat PAD in their practices and did not have any background focused on the diagnosis and treatment of PAD.

137.   As stated in this email by Flieder, Lifeline conducted PAD evaluations for "all patients" who visited the Center. Lifeline did not base such evaluations on physician orders for testing.

Rather, it was Lifeline's absolute policy and practice to evaluate every patient for PAD so that Lifeline would generate revenues from lucrative procedures to treat PAD.

138.   Lifeline's screening criteria for PAD included inappropriately low thresholds for diagnosing PAD and low thresholds for ordering procedures to treat PAD.  For example, Lifeline circulated a PAD Risk Assessment Form to the investor physicians and their practice groups. Lifeline's Form stated, "non-invasive testing should be considered for patients with a positive finding on the PAD risk assessment." Any one of the following was considered a "positive finding":  (1) 65 years or older, (2) 50 years or older and any history of smoking or diabetes, (3) leg pain with exertion, or (4) any lower leg or ankle or foot wounds "slow to heal."

139.   In reality, Lifeline insisted on PAD screening and testing for every patient who visited the vascular access center.  Lifeline also mandated that the investor physicians arrange for PAD screening of every patient in their practices.

140.   Below this message, Flieder listed the number of referrals for PAD procedures by each investor physician. Leading the list were Dr. Barrerro, Dr. Cueli, and Dr. Casaretto.

141.   Lifeline required all investor physicians to assess their patients for potential PAD procedures and also required all patients visiting the Center to undergo evaluation for PAD procedures. The reason wasn't medical necessity. Lifeline's reason was profits: PAD procedures were paid at a higher reimbursement rate than vascular access services.

142.   In his email of "action plan," Flieder also provided another updated list of referrals by the investor physicians to the Center for the time period of April-June 2014.  Leading the list of investor physicians with the highest referrals were Dr. Barrero, Dr. Cueli, and Dr. Casaretto.

143.   Flieder's "action plan" sent to the investor physicians was reviewed and approved by Lifeline's General Manager, Richard Nee. Nee reviewed and approved the pressure on investor

physicians to refer more patients.

144.    Before he sent this action plan, Flieder received an email from Richard Nee, Lifeline's national General Manager. In this email dated September 29, 2014, Nee stated, "[T]his is the big one. We have investor physicians that are not sending patients. I do not want this obligation to fall to MJ [the Center's nurse administrator]. Need to talk about the outcomes and service that the center is providing, attach the report that looks at patients by doc and highlight docs that are not sending and politely raise the question of why."

145.    The national General Manager of Lifeline instructed Flieder to evaluate patient data from all the practices of the investor physicians and then question each investor physician about why any patients were not sent to the Center.

146.    Lifeline's national strategy led by its national General Manager was a major intrusion into confidential patient data from the practices of investor physicians.  Lifeline's national business strategy was to use such confidential patient data to track where and for what medical issues each patient received care and then pressure investor physicians each week or month to refer every patient within their practices.

147.    First and foremost, Lifeline's goal was to identify potential candidates to undergo invasive procedures that would bring significant revenues to the organization. To capture those patients they screened as many individuals as possible. The first step was accomplished by using a patient questionnaire containing certain criteria that made the presence of PAD more likely. Each one of those criteria was assigned a value from which a total point score was generated and compared to a probability scale. The higher a score, the higher the probability of PAD.

148.    This "screening tool" was developed to be highly sensitive (meaning capable of discovering the vast majority of patients with PAD) but not too specific (meaning the test is likely

to overestimate the incidence of PAD, creating what is known as a " false positive" result). A very sensitive but non-specific test generates a higher "need" for secondary testing to confirm or deny the presence of a particular disease or abnormality. However, at the core of that assumption is the implication that every patient in the "risk group" with an abnormal score  is a candidate for additional testing.

149.   The truth is that not all patients with high scores in Lifeline's Questionnaire (suggesting the presence of various degrees of PAD) require additional non-invasive diagnostic procedures. In some patients such diagnostic tests may lead to invasive interventions that portend additional health risks and may cause more harm than good. Furthermore, in many cases, there is no proof of benefit. Therefore, in those patients, medical therapy without resorting to invasive testing is an excellent management alternative.

150.   The second step and the way the Lifeline PAD care model addressed the issue of a high score in the screening questionnaire was by performing a Doppler ultrasound of the arteries and a test called the arterial brachial index (ABI) The ankle-brachial pressure index (ABPI) or ankle-brachial index (ABI) is the ratio of the blood pressure at the ankle to the blood pressure in the upper arm (brachium). Compared to the arm, lower blood pressure in the leg is an indication of blocked arteries due to PAD. The ultrasound probe applied externally (in the area overlying the vessel pathway) captures images generated by the blood as it circulates downstream to the distal parts of the lower limbs and can provide information on the volume and velocity of the flow.

151.   Upon a "positive" result (meaning an abnormal test suggesting the presence of poor flow due to arterial blockage), the decision must be made on whether the patient will benefit from additional testing to confirm the presence of PAD or not.

152.   The third step under Lifeline's mechanistic approach dictated that when patients were

identified with potential blockages affecting the arterial vessels supplying the lower limbs, an invasive procedure was required and ordered. This approach was not and is not beneficial for a significant number of patients who did not have any symptoms.

153.    The purpose of the invasive test (angiogram) is to determine the clinical relevance of the findings reported on the screening noninvasive (step two) test. This radiologic intervention allows physicians to obtain direct information about the severity of the lesion causing the blockage, its impact on the blood flow to the leg, and the presence of alternative circulatory pathways called collaterals. These latter vessels are naturally developing arteries that enable the circulation of blood downstream effectively bypassing the blockage. "Nature's bypasses" fulfill a role similar to the side streets when the main thoroughfare is congested or interrupted.

154.    Depending on the severity of the anatomical findings, the interpreting radiologist or interventional radiologist may recommend vascular instrumentation (removal or obliteration of the lesion or plaque causing the obstruction by means of an angioplasty or atherectomy with or without stenting), standard vascular surgery or conservative medical and pharmacologic care. The angiogram or angiography requires the intravascular injection of radio-contrast (iodine dye) to delineate the anatomy of the arteries. The vascular instrumentation (if indicated) requires the use of dye as well.

155.    This dye material can be toxic to the kidneys. Patients with pre-existing advanced kidney disease are susceptible to experience incremental damage when exposed to it. Leading scientific studies have confirmed that preservation of the residual kidney function conveys a survival advantage among patients with moderately severe kidney disease. Thus, avoiding circumstances that threaten or harm the kidney function is sound practice. Lifeline's liberal use of angiographic studies was not and is not advisable. Therefore, time after time, the physician members of the

33

Kidney Group objected to the indiscriminate utilization of angiograms and opposed Lifeline's business model to aggressively over-diagnose PAD.

156.   On November 3, 2014, Flieder sent an email to the investor physicians that listed "the past three week's center volumes (by procedure type and by physician)." The following week, on November 10, 2014, he sent another email to the investor physicians with updated volumes of referrals by procedure type and by physician.

157.   In November of 2014, Lifeline began requiring the physician investors to provide detailed medical information regarding "where [their] patients are receiving care for access and PAD related healthcare needs." This requirement was orchestrated and communicated by Nee, Lifeline's General Manager, and Flieder, Lifeline's Vice President from Lifeline's headquarters in Vernon Hills, Illinois.

158.   On November 17, 2015, Flieder sent an email to the investor physicians and included two attachments "providing answers for those questions discussed during our conference call last Monday evening." One attachment provided by Flieder was a slide that stated, "Requesting Patient Data (MCP) so we can perform similar analysis to below." That slide showed an analysis of referrals by the physicians over different time periods and an analysis of "patients never seen at access center (by physician)."

159.   Lifeline required patient data from the investor physicians so that Lifeline could track which patients had not been to the Center and then pressure the investor physicians to instruct such patients to visit the Center for treatment regardless of medical necessity.

160.   On November 24, 2014, Flieder sent an email to the investor physicians in which he "required" each physician to send the following information for all of the ESRD patients in their practice groups: "patient name, patient date of birth, nephrologist, and dialysis center (where they

34

get their treatments)." Flieder stated, "[W]e want to provide a quantitative analysis of where your patients are going for access care."

161.   Dr. Valle and Dr. Bejar refused to provide data regarding all of their patients to Lifeline. Dr. Valle and Dr. Bejar only provided information regarding their patients already visiting DaVita centers. Flieder objected to this limitation and insisted on detailed information for all of the patients in their practice group.

162.   On November 24, 2014, Flieder sent an email to Jessica Anselm, the Office Manager of The Kidney Group, in which he stated, "I'll need this for all of your physicians, not just those invested in the Ft. Lauderdale center…" In pursuit of pressuring physicians for referrals, Lifeline had no regard for patient confidentiality.

163.   On December 1, 2014, Flieder continued sending weekly spreadsheets to the investor physicians that tracked the numbers and types of referrals from each investor physician to the Center.  In his email, Flieder stated, "Note volume was ~123 studies in November; 2nd highest volume of patient visits since opening (October was 139). Also, you'll be receiving the cash flow statement on a monthly basis going forward---that is expected to be ready the middle of the month."

164.   Lifeline's leaders repeatedly reminded the investor physicians that the average payment in PAD cases was close to 5 times higher than the average payments for dialysis-related vascular access procedures.

165.   In an email to the physician investors in December 2014, Flieder stated, "I'm responsible for our PAD results nationwide and have an active interest in all of our centers providing PAD services, as well as those planning to begin a PAD program."

166.   In December of 2014, Flieder introduced Chris Cook, Lifeline's new Regional Operations

Director, to the physician investors. Flieder stated, "I will continue to remain involved with the center on an ongoing basis."

167.   In December of 2014, Flieder and Cook attended a physician investor board meeting in Ft. Lauderdale. At this meeting, Flieder and Cook presented slides regarding the Center's "Operations Review." One slide stated, "To date we've seen less than 50% of investor's patients, further supporting growth volume growth expectation."

168.   For each physician investor, Lifeline gained access to the physician's patients by name and routinely monitored how many of these patients had visited the Center. Lifeline routinely used such information to pressure each physician investor for more referrals of his or her patients.

169.   A slide presented by Lifeline's executive at this meeting with physician investors also stated, "PAD volumes have significant upside; we've performed risk assessments on <25 % of investor physician patients (note: 2015 PAD budget volumes/mix drive ~ 70% of 2015 budgeted increase in revenue)."

170.   For each physician investor, Lifeline routinely monitored how many of his or her patients had been referred to the Center for PAD screening or procedures. Lifeline used such information to pressure each physician investor for more referrals of patients for PAD "risk assessment" and PAD procedures.

171.   Lifeline's executives also communicated to the physician investors that expected PAD referrals represented about 70% of the Center's 2015 "budgeted increase in revenue." Lifeline repeatedly told physician investors that the Center's revenues and profits for distribution to the investor physicians were dependent on the physicians' referrals of patients for PAD screening and procedures.

172.   In May of 2015, Lifeline's Regional Operations Director, Chris Cook, sent an email to all

investor physicians confirming that he visited every investor physician's office to "engrain the PVD [peripheral vascular disease] screening procedure into each office's routine." With aggressive pressure on investor physicians to refer patients for PAD screening and procedures, Lifeline also exerted pressure on staff employees at each physician's office. Lifeline routinely interfered with the clinical management of such practices by requiring PAD screening procedures for all patients of these practices.  Lifeline targeted patients with earlier stages of kidney disease from all nephrology practices of the investor physicians as a strategy to generate more revenues.

173.   On May 21, 2015, Cook sent an email to all investor physicians that included "the access center volumes by procedure type and physician for 2015." Lifeline continued to track and pressure investor physicians for more referrals and attempted to induce them to compete against each other for highest volumes of referrals.

174.   In May of 2015, Chris Cook, Lifeline's Regional Operations Director, also scheduled a mandatory dinner meeting for the investor physicians' practice managers.  In an email to investor physicians dated May 21, 2015, Cook stated, "I want to emphasize the importance of building these relationships and incorporating the PVD Risk assessments into the office routine."

175.   On June 10, 2015, Cook sent an email to Dr. Valle and Dr. Bejar in which he stated, "We have not received an updated patient list from our leakage analysis from your group yet. We need a list of ESRD patients inclusive of dialysis center and physician. Please send as soon as possible for me to prepare the data for our meeting on the 18th."

176.   Lifeline was relentless in pressuring physicians for confidential patient data. Lifeline insisted on obtaining data from every patient in Dr. Valle's and Dr. Bejar's practice group. Lifeline's objective was to find out where such patients were receiving dialysis and vascular access services and then to pressure the investor physicians to direct such patients to the Center.

177.   In the July 2015 "Operations Conference Call" between Lifeline executives and the investor physicians, Lifeline's executives pressured investor physicians to "reach out to patients who refuse further PAD screening or procedures." The physicians were instructed to provide "updates by 8/17."

178.   Lifeline's Regional Operations Director also routinely provided an "updated utilization analysis." This phrase was Lifeline's code phrase used to analyze the volume and value of referrals from investor physicians.

179.   In an email dated August 10, 2015 to the investor physicians, Cook provided "action items" from the July Operations Conference Call.   Cook stated, "The preliminary findings for the utilization analysis showed that 54% of practice patients have never been to the center. A list of patients will be provided to each group. Please review each list and identify if or where the patients are obtaining their care and what barriers exist to prevent LL [Lifeline] from providing care. Please update this list and communicate this back to LL for further discussion by 8/21."

180.   Lifeline continued to intrude into the medical practices of physician investors by monitoring referrals, requiring investor physicians to investigate why their patients had not visited the Center, and pressuring such patients to visit the Center. All the while, Lifeline's executives communicated the message that the Center's revenues and profit distributions to the physician investors were dependent on the physicians' volumes of referrals of patients for procedures with high reimbursement codes.

181.   The action items from the July 2015 Operations Conference Call also included a list for Cook to "complete utilization review" of referrals by each practice group of investor physicians, "weekly meeting on PAD and ESRD list status," and "[w]ork with Steve Flieder to improve and customize an electronic follow up system for PAD."

182.   On August 4, 2015, Cook conducted an "Operations Call" with investor physicians and presented more slides. He started the call by identifying the "problem" of "no consistent financial improvement over the last 5 months." Cook said the "top focus" was "PAD."

183.   Cook presented a slide that stated, "Response to Patient Refusals were due 7/10/2015." Cook identified two physicians who were "prompt in response." "All others were followed up by Lifeline." The slide stated "31/41 Patients Reached." The slide also stated "currently awaiting physician response" from 5 physicians.

184.   Even for patients who had declined PAD treatment, Lifeline required the investor physicians to contact such patients and pressure the patients to visit the Center. Lifeline tracked communications with each patient to ensure the patients were pressured to go to the Center.

185.   Cook also presented a slide that stated, "Preliminary findings show 54.4 % of practice ESRD patients have never been to the center. This is up from 47.5% in December." Cook called this "leakage analysis" which was a code word for how many patients were "leaking" or slipping through Lifeline's referral trap.

186.   This slide also stated, "List of ESRD patients were due 6/26." Lifeline persisted in pestering the investor physicians to disclose confidential patient data not for any legitimate medical reason but to pressure such patients to visit the Center.

187.   Lifeline continued to monitor how many patients from the physicians' practices had not been referred to the Center and to pressure investor physicians to refer more patients to the Center.

188.   Cook also presented a slide to the investor physicians that listed volumes of referrals by each investor physician for the first and second quarters of 2015. In the second quarter, Dr. Casaretto led all physicians in the numbers of referrals to the Center.

189.   At the same dinner and operations call with investor physicians in August of 2015, Cook

included a slide that stated, "Encounters increased by 34 from May to June, Revenues decreased by $21k." The Lifeline slide further stated, "Not all encounters are created equal." Cook then provided a detailed analysis of reimbursement rates for different CPT codes and urged the investor physicians to refer patients for procedures with higher reimbursement rates.  Office visits and ultrasounds generated "low or no reimbursement," while "PAD, angioplasty, thrombectomy" generated the "highest reimbursements." Cook cited a "[d]ecrease in high reimbursement codes" and an "[i]ncrease in low reimbursement codes." Cook's slide further stated, "This variation in code reimbursement mix can lead to abrupt shifts in revenue."

190.   Cook also presented data that for the time period of May-June 2015, the Center was under budget in high reimbursement code procedures by 5 cases and over budget in low reimbursement codes by 57 cases. Cook presented a slide with gross charges for various kinds of both high reimbursement procedures and low reimbursement procedures.

191.   Lifeline didn't simply pressure investor physicians for referrals. Rather Lifeline pressured investor physicians to refer patients for procedures with high reimbursement codes.  Lifeline used the constant promise of higher revenues for distribution to the investor physicians and the threat of capital contribution calls as leverage to induce such referrals.

192.   Cook ended his presentation with a slide titled "Focus." Lifeline's focus was on "PAD 41 List, PAD 103 List, PAD Follow-up List, Follow-up on Patient Refusals." Lifeline's focus was also on "Follow-up of Utilization List" for renal failure patients of the investor physicians that had not visited the Center. The presentation ended with the exhortation to the investor physicians: "be prepared to close." Lifeline pressured the investor physicians as if they were commission sales people and the "products" being sold were high reimbursement code procedures for Medicare patients.

193.   On August 26, 2015, Cook sent an email to all physician investors regarding "Lifeline---Action Items from Previous Conference Call." Cook provided this instruction to investor physician: "Physicians will reach out to patients who refuse further PAD screening or procedures. An update list will be sent to each physician that has any pending." Lifeline's strategy included repeatedly requiring investor physicians to pressure patients who declined PAD screening.

194.   Cook also wrote in this email to investor physicians: "The preliminary findings for the utilization analysis showed that 54% of practice patients have never been to the center. A list of patients will be provided to each group. Please review each list and identify if or where the patients are obtaining their care and what barriers exist to prevent LL from providing care."

195.   On August 27, 2015, Cook sent an email to all investor physicians with a spreadsheet of "access center volumes by procedure type and physician for 2015." The spreadsheet listed the number of referrals by each investor physician for each week of 2015. The spreadsheet also ranked the physicians by volume of referrals. At the top of the rankings were Dr. Barrero and Dr. Casaretto. In this email, Cook also provided the dial-in number for the conference call scheduled on August 31, 2015.

196.   On August 31, Cook conducted another "operations call" with physician investors.

197.   Prior to the call, Linda Sinclair, Executive Assistant at Lifeline's national headquarters in Illinois, circulated a number of documents to the investor physicians by email on August 25, 2015. She wrote, "Attached are the following documents: Agenda, Outcomes, Referrals, and Case Costing Reports."

198.   Lifeline routinely circulated spreadsheets of "monthly physician referrals" that tracked the volume and value of every referral by investor physicians. Lifeline used this data to communicate the message to investor physicians that Lifeline was watching, monitoring, and calculating their

referrals to the Center each month.  Lifeline routinely used this data to pressure investor physicians for more referrals and routinely communicated the message that the Center's profits and distributions to the physicians were dependent on such referrals.

199.    On the August 31, 2015 "operations call," Cook began his presentation with a slide that stated, "Problem---No consistent financial improvement over the last 7 months." His next point was: "Preliminary findings show 47.9% of practice ESRD patients have _never_ been to the center. This is up from 47.5% in December." The slide then stated, "_Critical_ that we identify barriers to patient care for these patients."

200.    With increasing urgency, Lifeline blamed the financial condition of the Center's operations on the investor physicians' failure to refer more than 47 percent of their patients to the Center.

201.    In the next slide, Cook represented that Lifeline's goal was to "capture" 80% of the patients from the investor physicians' practices. Lifeline's "plan" to accomplish that goal included the following actions: "lists are distributed to practices, weekly follow up with physicians to identify barriers, and develop strategies around barriers." Lifeline's plan was relentless pressure on investor physicians and intrusion into the clinical management of all patients of the physicians' practices.

202.    According to Cook's presentation, the "key focus area was PAD" procedures. The action "plan" included: "mine previous PAD data," "weekly meetings to review progress and follow-up plan," "all patients receive risk assessments in the center," and "risk assessments distributed to each practice with instruction to screen all patients."

203.    Lifeline continued to mandate PAD screenings for all patients within each physician investor's practice group regardless of the patient's medical conditions and regardless of physician judgment.  Lifeline also continued to mandate PAD screening for all patients who visited the Center regardless of the patient's medical conditions and regardless of physician orders for such

testing.

204.   Cook also presented a slide that ranked the investor physicians according to the numbers of patients recently referred to the Canter. At the top of this ranking were Dr. Barrero and Dr. Casaretto.

205.   Cook also presented a slide that ranked the number of total referrals by each investor physician for YTD 2015. Lifeline called these referrals "Encounters by Physician YTD 2015." At the very top of the ranking was Dr. Casaretto with 178 referrals so far in 2015.

206.   Cook also presented a slide that tracked every investor physician according to case mix. For each investor physician, Lifeline created a graph showing the numbers of referrals the physician made for PAD procedures, angiograms, angioplasty, chronic venous insufficiency, thrombectomy, and other procedures. In listing the volume of referrals and the type of procedures each investor physician referred, Lifeline again attempted to pressure the physicians for high reimbursement referrals and to create competition among the physicians for highest and most lucrative referrals.

207.   Cook also showed a slide that revealed that Lifeline's pressure on investor physicians was effective in driving volumes of patients seen at the Center. By August of 2015, the numbers of referrals in 2015 had grown to 635 as compared to 520 in all of 2014. Year-to-date "patient encounters" or referrals were 246 over budget, but the revenue per referral was $520 less than budgeted. Lifeline responded by ramping up pressure on investor physicians for referrals of patients with high reimbursement procedure.

208.   The final slide in Cook's August 31, 2015 presentation to investor physicians ended with the exhortation "be prepared to close."

209.   Lifeline sought to transform the physician investors into aggressive commission

43

salespeople for the Center and urged them to be "prepared to close" in selling PAD procedures and the Center to their patients.

210.   On September 3, 2015, Lifeline's Vice-President, Steve Flieder, sent an email to the investor physicians and introduced a "foot check for patients visiting Lifeline center in Pompano Beach." Lifeline's Vice-President stated, "Good morning, I wanted to let you know that next week we'll be testing a foot check program in the Pompano center to improve our ability to detect peripheral artery disease. The foot check will be a supplement to (and not replace) our current PAD risk assessment process at the center." Flieder further stated, "[T]his test includes a few questions, a visual and neurological test, and takes only about 1 minute to perform."

211.   Lifeline's 1-minute foot check to diagnose PAD was another example of the low thresholds used by Lifeline to generate more revenues for PAD procedures.

212.   For all patients who visited the Center, Lifeline conducted an arterial brachial index, a non-invasive screening test to evaluate for the presence of PAD. Lifeline offered this test free of charge to all patients. If patients had any abnormal findings, Lifeline scheduled such patients for diagnostic angiograms and additional radiology procedures.

213.   The investor physicians were under such pressure from Lifeline to refer high reimbursement procedures that in late August and September 2015, Dr. Valle sent an email to Cook requesting procedure data and performance metrics at the Center compared to Lifeline's centers nationwide for 2014 and 2015.   Cook provided reports that confirmed that Lifeline's system of tracking high reimbursement procedures, patient volumes, and growth in PAD procedures was a national strategy to boost revenues.   The data used by Lifeline to pressure the investor physicians in Ft. Lauderdale was the same data tracked and used by Lifeline in other vascular access centers in other states.

214.   On September 24, 2015, Lifeline organized a "joint venture partner dinner" with the investor physicians. At that dinner, Cook presented another slide show to the investor physicians.

215.   The first slide repeated similar information cited by Lifeline's executives for months: "47.9% (464) of practice patients have not visited the center." Lifeline demanded "80% capture" of the patients of the investor physicians' practice groups.

216.   In the first slide, Lifeline's plan was to continue distributing lists of patients who had not visited the Center, "follow up with physicians to identify barriers," and "develop strategies around barriers."

217.   Lifeline's plan to boost referrals and revenues was also to require "all patients [to] receive a 3-month access evaluation apt." Lifeline instructed the investor physicians that all patients of their practices were required to attend an evaluation appointment at the Center.

218.   Cook also reported that the "September PAD volume" was "highest volume this year." Lifeline's illegal tactics were effective to boost referrals of patients for PAD procedures.

219.   Cook also presented the "PAD 41 List" that was the list of patients who declined PAD evaluations or procedures. Lifeline persisted in requiring the investor physicians to pressure the patients to visit the Center.

220.   Lifeline's plan for PAD growth was more of the same scheme of intrusion into patient data at all physician practices and persistent pressure on the investor physicians to refer patients for PAD procedures despite the fact that investor physicians were nephrologists who did not treat PAD in their practices. Cook presented a slide with the "Plan" of "single owner accountability…tracking patients," "mine previous PAD data," "weekly meetings to review progress and follow-up plan," "all patients receive risk assessments in the center," and "risk assessments distributed to each practice with instruction to screen all patients."

45

221.   Cook also presented another slide that ranked investor physicians by volume of referrals to the Center. Dr. Barrero and Dr. Casaretto again led the list with the highest numbers of referrals.

222.   Cook also presented a slide that compared the case mix at the Center with Lifeline's national case mix. Lifeline closely monitored case mix and high reimbursement procedures at each of its vascular access centers. The data used by Lifeline to pressure physicians for high reimbursement referrals was not unique or limited to the Ft. Lauderdale Center. Rather. Lifeline's national executives led a scheme at the Ft. Lauderdale Center that was a part of their national scheme to exploit, induce, and pressure investor physicians for referrals.

223.   Cook also presented a slide that ranked investor physicians by the volume of referrals for all of 2015. Dr. Casaretto again led the list with the highest number of referrals to the Center.

224.   Cook also presented a slide that showed the number of "patient encounters" or patient referrals had increased by 106% in 2015 as compared to 2014. Lifeline's illegal strategy to induce referrals was effective in boosting patient volumes at the Center.

225.   On September 29, 2015, Cook sent an email to the physician investors that provided a summary of the dinner meeting.

226.   Cook touted Dr. Casaretto's office for his high volume of referrals of patients for PAD procedures. "Dr. Casaretto's office has built in the screening process in their routine." Cook described that process: "Once the patient fills out the risk assessment and it is positive, they contact the access center to schedule the patient immediately." The risk assessment used by Lifeline contained low thresholds for positive findings. Lifeline deliberately used inappropriately low thresholds to subject more patients to lucrative PAD procedures.

227.   Cook also introduced the new manager at the Center---Jessica Eggleton.

228.   According to Cook, the "action items" from the dinner meeting included the following:

"The PAD weekly meeting will identify patients that refuse screening and/or treatment. This information will be shared with the referring physicians to discuss the importance of treatment. **Weekly**." (bold in original). Cook also instructed Eggleton as follows: "Send email to each physician for pending PAD patient refusals. **Weekly**."

229.   Lifeline also changed their term for analyzing referrals from each physician. Up until this time, Lifeline called such analysis "utilization review." Starting in September 2015, Lifeline called it "access to care analysis."

230.   On September 29, 2015, Cook wrote an email to investor physicians that stated: "The findings of the Access to Care analysis showed that 54% of practice patients have never been to the center. Please identify what barriers exist to prevent LL from providing care. Dr. Casaretto's practice is reviewing each patient to identify potential barriers. I will follow up on **10/9** for identified barriers with each practice." (bold in original).

231.   All of the reports in which Lifeline tracked and monitored the volume and value of referrals from investor physicians originated from Lifeline's national headquarters in Vernon Hill, Illinois. On October 22, 2015, Janet Greenwald at Lifeline's national headquarters sent an email to the investor physicians attaching the same spreadsheets tracking referrals from each investor physician that Lifeline had used in multiple prior presentations.

232.   Greenwald's email to the investor physicians attached the "following documents for your center for Q3 2015: Outcomes, Referrals, and Fluoro Times Summary."

233.   Greenwald attached reports for both the Center and for Lifeline's overall national operations, including the quarterly national outcomes.

234.   The quarterly physician report again tracked and counted referrals from every investor physician. The physician with the highest number of referrals in the 3rd Quarter of 2015 was Dr.

Casaretto.

235.   Greenwald also provided a "National Outcomes Report" that listed detailed data on the numbers of different procedures performed at Lifeline centers in the 3rd quarter of 2015. This national report analyzed the 32,309 patient encounters and listed the percentages of different "reasons for referrals."

236.   Later on April 21, 2016, Greenwald sent similar reports to the investor physicians. Lifeline's system of tracking referrals and procedures was meticulous, ongoing, and national in scope.

237.   Lifeline's monitoring and pressure on investor physicians for referrals was relentless month after month. In the fall of 2015, Lifeline intensified such pressure by threatening a "cash call" on investor physicians if revenues did not improve and dilution of investment shares if they did not invest more cash into the joint venture.

238.   In November of 2015, the physician investors sent Lifeline's leadership a list of concerns about the operations of the Center, including a request for a "legal opinion if referrals from our nephrology practices for PAD screening and angiograms, atherectomies [are] violating any Stark regulations, or any other OIG violations." Lifeline's executives refused to respond to this request.

239.   At Lifeline's meeting with investor physicians on December 1, 2015, Cook showed a series of slides. Cook began the presentation with a slide titled, "Turning the Corner." The first sentence stated, "RTP over budget for Center!---$34,456." "RTP" means return to practice or return to the investor physicians. Lifeline represented that amount would be distributed to the investor physicians as profits in the month of October 2015.

240.   The slide also stated, "Focus on Access and Focus on PAD is working!" "We need full physician support to take us to the next level!"

241.   Another slide listed the PAD screening process mandated by Lifeline for investor physicians: "1--- Patients complete risk assessment in office, 2---Physician reviews importance of treatment with patient, 3---Office schedules patient for ABI/TBI at access center prior to patient leaving the office."

242.   The slide touted "November PAD volume---3[rd] straight month highest for the year." Lifeline's illegal inducements for PAD referrals were effective in ramping up PAD procedures at the Center.

243.   Cook also addressed "physician practice visits of 1-2/week." The "outreach plan" was "integrate with Physician's practice, review operations/scheduling, review screening processes, and reach CDK and PD patient population." Lifeline persisted in infiltrating the investor physicians' practices and mandating referrals.

244.   As an inducement for continuing referrals, Lifeline presented a slide that listed projected profits to be distributed to the joint venture in 2016. The amount was $552,683.

245.   Cook also presented a slide with projections of profits to be paid to the investor physicians in subsequent years, including $344,716 in 2018, $341,424 in 2019, and $337,449 in 2020. Lifeline used these projections to assure the investor physicians that their referrals would lead to lucrative distributions from profits at the Center.

246.   Cook also presented a slide showing the sources of payments to the Center since February 2014. Medicare of Florida led all payers with payments of $2,641,014 out of $3,638,431 in total revenues. Medicare payments have accounted for approximately 72% of the Center's revenues.

247.   Cook also presented a slide with the title, "What does success look like?" Following this question, the slide stated, "Reach 80% of practice utilization of ESRD patients." The slide also stated, "Improve monitoring of patient access." These were code words for Lifeline's strategy to

induce investor physicians to redirect all patients from their practices to the Center.

248. The slide also stated, "Make PAD screening a staple in the practice office visit process." Lifeline continued to mandate that investor physicians ensure that all patients in their practice groups were screened for PAD despite the fact that such physicians did not normally evaluate or treat PAD in their practices.

249. Cook presented a slide showing that "47.9% (464) of practice patients had not visited the center." Lifeline continued to use confidential patient data to monitor and pressure the physicians to redirect more of their practice's patients to the Center.

250. Cook also presented a slide with pie charts tracking the case mix at the Center compared to Lifeline's national case mix at other centers. The slide included pie charts for the month of October 2015 and 2015 YTD. Lifeline conducted regular reviews of their case mix at centers they operated to pressure physicians for referrals of high reimbursement code procedures.

251. Another slide presented by Cook showed that the Center was treating 4 more patients per day compared to the prior year. Patient "encounters" in 2015 had increased by 785 compared to 2014. Lifeline's constant pressure and inducements for referrals were effective in boosting volumes of patients at the Center.

252. The slide also stated, "Make PAD screening a staple in the practice office visit process." Lifeline continued to intrude directly into the physician investors' clinical practices to require screening of patients for referrals to the Center.

253. On December 3, 2015, Cook sent an email "recap of action items" from the December 1 conference call with investor physicians. The physician investors' concerns were not listed in this email and numerous physicians objected to the accuracy of his "recap."

254. On December 9, 2015, the Center's manager and Lifeline employee, Jessica Eggleton, sent

50

a text message to selected investor physicians that stated, "Good afternoon, I just wanted to let you know that the phone calls and faxes for PAD referrals had slowed down dramatically. We were getting around 7 scheduled a day and we have only received on [one] this entire week. I know there are more patients we can reach than that. If we don't get back on track Jan will not be a good month for us. We cannot do ABI/PAD without your support. Please contact me if you have any questions."

255.  Lifeline again threatened the investor physicians with a revenue shortfall for the joint venture if they didn't refer more patients for PAD procedures.

256.  In early January 2016, Lifeline issued a cash call letter to the investor physicians with a 30-day deadline.

257.  On January 22, 2016, Cook circulated spreadsheets that ranked investor physicians by the number of referrals to the Center in 2015. At the top of the list was Dr. Casaretto with 353 patients referred in 2015.

258.  Cook also provided a spreadsheet that ranked the value of referrals from the practice groups of each investor physician. At the top of the ranking was Dr. Casaretto's group that referred cases with collections of $1,177,890.42 in 2015.

259.  On January 22, 2016, Cook sent another email to the investor physicians regarding "2016 Encounter Volume." Cook stated, "Below is the encounter detail for the first 2 weeks of 2016. Volume is down…We are paced to be short on PAD. This will have the largest impact on January financials…Jessica will be notifying practice physicians on daily volume." Cook also provided another chart that ranked the investor physicians according to volumes of referrals in the first two weeks of January. At the top of the list again was Dr. Casaretto.

260.  Although Cook pretended to be concerned about patients "getting the proactive care that

they need," Cook's email was a clear message to investor physicians that the January profits for distribution to the investors were dependent on them referring more patients for PAD procedures.

261.   After Cook's email, the investor physicians received multiple messages from Jessica monitoring the daily volume of referrals for PAD procedures.

262.   On February 3, 2016, Cook sent an email to the investor physicians: "We have an important update on the capital call status and valuation of our venture. I appreciate everyone's attendance with this short notice as we have a short timeframe to make decisions." Lifeline never disclosed the methodology used to value the joint venture or determine the amount of the cash call.

263.   The next day, Cook organized a conference call with the physician investors and circulated a slide presentation before the call. The title of the presentation was "Joint Venture Update."

264.   One slide listed a negative cash balance for the joint venture of $447,551. According to Cook's slide, the minimum cash balance for operation of the Center was $555,958. The capital call amount was $1,003,510. The next slide listed volumes of PAD procedures on the schedule for February 2016. After listing the negative cash balance of the joint venture, the next slide stated, "Identification of patients that need proactive access care that have not been to the center." Lifeline's executives regularly used the threat of a cash capital call combined with pressure on the investor physicians to refer more patients.

265.   On February 11, 2016, Cook circulated another slide presentation to the investor physicians. The title of this slide presentation was "Joint Venture Investment Opportunity." On that date, Lifeline's national General Manager, Richard Nee, led a conference call with the investor physicians and presented another slide show.

266.   The first slide stated, "Center projected to be cash positive in 2016---Continued improvements in PAD volume…"

267.   Another Lifeline slide was titled "Access to Care---Practice Utilization." This slide stated, "Each 1% Increase is worth ~$30,000 to RTP." This statement referred to each 1% increase in referrals was worth approximately $30,000 in profits to be distributed to the investor physicians. "RTP" is "return to practice." Lifeline again attempted to induce the physicians to refer more patients to the Center.

268.   This same slide also projected the increased profits that would be distributed to the investor physicians if referrals increased to different percentages of their practices' patients. If 60% of the practices' patients were referred to the Center, profits to be distributed to the investor physicians would increase by $235,855. If 80% of the practices' patients were referred to the Center, profits to be distributed to the investor physicians would increase by $828,936.

269.   This slide also stated "Lifeline Network Utilization---72.2%."

270.   In discussing this slide, Lifeline's national General Manager confirmed that Lifeline's network of vascular access centers owned with investor nephrologists "is tightly controlled and monitored" by Lifeline's national executives and "72% of the patients on average" of investor physicians were treated at such access centers. Lifeline's national General Manager stated, "What I am saying is that in our network which is tightly controlled and monitored we see 72% of the patients on average."

271.   Lifeline's national General Manager also stated that under its joint venture model with investor physicians who refer on average 72% of their patients, the "return to practice" or distribution to such physicians is "about $600,000" each year. On this conference call, Lifeline's General Manager stated, "I did not put on here but I probably should have at 72% our return to practice is about $600,000." "So if we [compare] our center to the average performance of output of a center per patient at 72% we see about $600,000 return to practice."

272.   Another slide was titled "PAD Program." This slide stated, "Significant increase in PAD interventions...Average reimbursement per intervention: $10,430...Projected PAD intervention increase by 100 cases for 2016...Projected Revenue increase of $1,564,500."

273.   That slide also showed the numbers of PAD procedures increasing dramatically over the four quarters of 2015.   Lifeline's illegal strategy was effective in increasing the numbers of referrals for PAD procedures.

274.   Another slide tracked monthly revenues at the Center dating back to January 2014 and projected rising revenues to over $300,000 per month for each of the subsequent months in 2016. An additional slide projected revenues rising to 3.69 million in 2016, 3.76 million in 2017, 3.84 million in 2018, 3.91 million in 2019, and 3.99 million in 2020. Lifeline continued to entice and induce the investor physicians with projections of lucrative revenues for distribution---all dependent on the value and volume of referrals by the investor physicians.

275.   Another slide provided projected profit distributions to the investor physicians: $552,683 in 2016, $547,960 in 2017, $542,364 in 2018, $535,847 in 2019, and $528,356 in 2020.

276.   During the February 11, 2016 conference call with investor physicians, the General Manager of Lifeline, Rich Nee, represented that if South Florida Vascular Solutions did not want to invest additional dollars, Lifeline would invest the full amount. Cook circulated minutes of the meeting confirming that Nee made this representation.

277.   On February 23, 2016, Cook sent another email that ranked investor physicians by volumes of referrals in the first 6 weeks of 2016.   Dr. Casaretto again led the rankings with the most referrals. In this email, Cook stated, "Dialysis center engagement is showing an increase in access related encounters. We are also seeing an increase in PAD encounters." Lifeline's pressure placed on physicians for more referrals in January reportedly paid off in February.

278.   Yet two days later, on February 25, 2016, Cook sent an email to the investor physicians in which he stated, "We are receiving significantly fewer risk assessments this month compared to previous months."

279.   On March 22, 2016, Cook sent another email to the investor physicians in which he again ranked the physicians according to their numbers of referrals in 2016. Dr. Casaretto again led the rankings with the most referrals. Cook also ranked the investor physicians' practice groups by numbers of referrals in 2016. Dr. Casaretto's group led with 258 referrals. The next closest group had only 51 referrals.

280.   In this email, Cook stated, "February was an improved month over January from a case volume perspective. We did miss our case mix goals by 6 Angioplastys and 3 PAD cases. This is reflective in the financial statement. Moving into March we are on PACE to reach our PAD goals, but lagging around Access."

281.   Lifeline again not only tracked referrals from each investor physician, but pressured physicians for the referral of certain procedures to achieve the case mix goals for the Center.

282.   South Florida Vascular Solutions (the investor physicians) decided against additional cash investments into the joint venture. Effective March 1, 2016, Lifeline diluted their interest from 49% to 22.1%.

283.   In April of 2016, Dr. Valle and Dr. Bejar learned that Lifeline did not invest the full amount to cover the capital call. Rather, after the interest of South Florida Vascular Solutions was reduced from 49% to 22.1%, Lifeline sold and transferred the difference (26.9% interest) to the physician with the highest referrals of patients to the Center: Dr. Alberto Casaretto and an entity he formed called "Vascular Ventures LLC." At no time did Lifeline ever disclose that it would sell the diluted shares to a third party.

284.    The physician members of South Florida Vascular Solutions had earlier agreed not to fund any further capital calls. Dr. Casaretto agreed with this decision. He also knew that any change in the ownership interest of any investor physician required 75% vote of the members of South Florida Vascular Solutions. Dr. Casaretto cut a clandestine deal with Lifeline that violated that Agreement.

285.    As a result of the share purchase Dr. Casaretto and his group increased their total ownership in the Center from 19.6% (40% interest in the original 49% owned by SFVS) to 35.5% (40% interest in the post dilution 22.0779% owned by SFVS equals 8.8312% plus 26.9222% representing the diluted shares). Thus he was rewarded with increased ownership in the Center through his two corporations.

286.    This secret transfer was a kickback to Dr. Casaretto for his high volume and value of referrals to the Center. Moreover, Lifeline wanted to increase Dr. Casaretto's investment interest in the Center so that he would be incentivized to refer even higher volumes of patients. Dr. Valle and Dr. Bejar refused to play the game of referring patients to the Center for the sake of increased profit distributions to the investor physicians. Dr. Casaretto played the referral game and he was rewarded by Lifeline.

287.    On May 11, 2016, Dr. Valle sent an email to Cook with 14 specific questions about the illegal transfer of shares to Dr. Casaretto's entity. Three weeks later on June 1, 2016, Cook sent a letter to Dr. Valle and copied the other investor physicians. Cook's letter did not answer any of Dr. Valle's questions.

288.    Dr. Valle has also repeatedly sent the same questions to Dr. Casaretto. Like Cook, Dr. Casaretto has refused to answer these questions.

289.    On July 29, 2016, Dr. Valle and Dr. Bejar learned that Lifeline was using the names of

doctors in their group, The Kidney Group, to order PAD screenings and PAD procedures on dialysis patients of their practice. The doctors of The Kidney Group did not consent to such actions and did not authorize such PAD screenings or procedures.

### Defendants' Inducements for Referrals Are Not Sanctioned by any AKS Safe Harbor

290.   Defendants' scheme of partnering with investor physicians to form vascular access centers and then aggressively tracking and requiring referrals was based on offering kickbacks in the form of profit distributions from the joint venture. By forming such joint ventures, Defendants provided these referring physicians an ongoing stream of kickbacks in the form of promised distributions of profits from the centers.

291.   As set forth above, the Office of the Inspector General (OIG) has recognized that such revenue streams pose a substantial risk of violating the Anti-Kickback Statute because the physician is in a position to earn profits based on the volume and value of referrals he or she sends to the joint venture. Accordingly, OIG has created a safe harbor that allows physician ownership within such joint ventures only if the transaction meets the eight requirements of the safe harbor. *See* 42 C.F.R. §1001.952(a)(2).

292.   Lifeline's joint ventures do not qualify for protection under that safe harbor. First, in many cases, physicians who refer business to the joint venture own more than 40% percent ownership. Investor physicians at Lifeline Vascular Center Ft. Lauderdale have owned 49% of the joint venture. Lifeline has orchestrated a higher percentage of physician ownership because that is their business model to leverage and pressure more investor physicians for more referrals.

293.   Second, Lifeline has expected that physicians who own part of a vascular access center will be responsible for more than 40% of the center's gross revenue. *See* 42 C.F.R. §1001.952(a)(2)(vi). Lifeline has closely monitored the gross revenues from referrals by investor physicians and

aggressively pressured such physicians for high reimbursement referrals. Lifeline's joint venture partners were nearly always the physicians who referred a high volume of patients to the centers and Lifeline's national business model has been based on exploiting such physicians for increased referrals.

294.   Third, physicians were generally only offered the opportunity to join a joint venture with Lifeline if they have referred patients to Lifeline in the past, or are in a position to refer patients to Lifeline vascular access centers in the future. Thus, the terms under which the physicians are allowed to invest are "related to the previous or expected volume of referrals, items or services furnished, or the amount of business otherwise generated from that investor to the entity." *See* 42 C.F.R. §1001.952(a)(2)(iii).

295.   A transaction that fails to comply with one of the safe harbors does not necessarily violate the AKS. Instead, the facts and circumstances surrounding such transactions must be analyzed to determine whether the physicians were offered inducements or anything of value to refer patients.

296.   As discussed above, Lifeline's joint venture business model with investor physicians is based on offering and exploiting such inducements. On a national level, Lifeline has implemented a scheme to leverage relationships with investor physicians to induce them to refer patients in violation of the Anti-Kickback Statute.

## Count I--- False Claims Act 31 U.S.C. § 3729(a) (1)(A), Causing False Claims for Payment

297.   Relators repeat the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

298.   In pertinent part, the False Claims Act establishes liability for "any person who…knowingly presents, or causes to be presented, a false or fraudulent claim for payment or

approval." 31 U.S.C. § 3729(a)(1)(A).

299.   Lifeline and DaVita knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented false claims "for payment or approval" to the United States in violation of 31 U.S.C. § 3729(a)(1)(A).

300.   This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

301.   Through the acts described above, Defendants knowingly or in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, presented or caused to be presented, false claims to officers, employees or agents of the United States Government, within the meaning of 31 U.S.C. § 3729(a)(1)(A).

302.   The United States was unaware of the falsity of the records, statements and claims made or caused to be made by Defendants. In reliance on the accuracy of the claims, information, records, and certifications submitted by Defendants, the United States paid and continues to pay claims that would not be paid if Defendants' unlawful conduct was known to the United States.

303.   As a result of the Defendants' acts, the United States has sustained damages, and continues to sustain damages, in a substantial amount to be determined at trial.

304.   Additionally, the United States is entitled to a civil penalty of between $5,500 and $11,000 for each false claim made or caused to be made by Defendants arising from their unlawful conduct as described herein.

## Count II---False Claims Act 31 U.S.C. 3729(a)(1)(B), Use of False Statements

305.   Relators repeat the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

306.   In pertinent part, the False Claims Act establishes liability for "any person who…knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

307.   This is a claim for treble damages and penalties under the Federal False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

308.   Through the acts described above, Lifeline and DaVita knowingly made, used, or caused to be made or used, false records and statements, i.e., the false certifications made by Defendants in submitting claims each fiscal year to get false paid or approved by the United States. Through the acts described above, the Defendants knowingly made, used, or caused to be made or used, false records and statements, and omitted material facts, to get false claims paid or approved, within the meaning of 31 U.S.C. § 3729(a)(1)(B). The records were false in that they purported to show compliance with the federal Anti-Kickback Statute.

309.   The Defendants knowingly made, used, or caused to be made or used false records or statements with the intent to get or cause these false claims to be paid by the United States. The statements were made knowingly because they knew, or in the exercise of reasonable care, should have known that its kickbacks to physicians violated the federal Anti-Kickback Statute.

310.   The United States was unaware of the falsity of the records, statements, certifications, and claims made or caused to be made by the Defendants. The United States paid and continues to pay claims that would not be paid if Defendants' unlawful conduct was known.

311.   By virtue of the false records or false claims made by the Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act to be determined at trial.

312.   Additionally, the United States is entitled to civil penalties between $5,500 and $11,000

for each false claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

## Count III---Federal False Claims Act 31 U.S.C. § 3729(a)(1)(C) Conspiring to Submit False Claims

313.   Relators repeat the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

314.   In pertinent part, the False Claims Act establishes liability for "any person who....conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)." 31 U.S.C. § 3729(a)(1)(C).

315.   This is a claim for penalties and treble damages under the False Claims Act, 31 U.S.C. § 3729, *et seq.,* as amended.

316.   Through the acts described above, the Defendants acting in concert with each other and other contractors, agents, partners, and/or representatives, conspired to knowingly present or cause to be presented, false claims to the United States and knowingly made, used, or caused to be made or used, false records and statements, and omitting material facts, to get false claims paid or approved.

317.   The Defendants conspired to withhold information regarding illegal inducements to physicians who were in a position to refer and/or influence referrals of Medicare, Medicaid, and TRICARE patients and federal employees or retired federal employees to Defendants.

318.   As a result, the United States was unaware of the false claims submitted and caused by the Defendants and the United States paid and continues to pay claims that would not be paid if the Defendants' unlawful conduct was known to the United States.

319.   By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

320.  By virtue of Defendants' conspiracy to defraud the United States, the United States sustained damages and is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## Count IV---Submission of Express and Implied False Certifications in Violation of 31 U.S.C. § 3729(a)(1)(B)

321.  Relators repeat the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

322.  In pertinent part, the False Claims Act establishes liability for "any person who…knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

323.  Compliance with the Anti-Kickback Statute was an explicit condition of payment under Federal Healthcare Programs.

324.  The Defendants' certifications of compliance with the Federal Anti-Kickback Statute were knowingly false.

325.  In reliance on Defendants' express and implied certifications, the United States made payments to Defendants under Federal Healthcare Programs. If the United States had known that Defendants' certifications were false, Federal payments under the Federal Healthcare Programs would not have been made to Defendants for each of the years in question.

326.  By virtue of the false records, false statements, and false certifications made by the Defendants, the United States sustained damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## Count V---Knowingly Causing and Retaining Overpayments in Violation of 31 U.S.C. § 3729(a)(1)(G)

327.   Relators repeat the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

328.   The False Claims Act also establishes liability for any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). The False Claims Act defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

329.   "An entity that collects payment for [Designated Health Services] that was performed pursuant to a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353(d).

330.   "The OIG may impose a penalty, and where authorized, an assessment against any person...whom it determines...[h]as not refunded on a timely basis....amounts collected as the result of billing an individual, third party payer or other entity for a [DHS] that was provided in accordance with a prohibited referral as described in [42 C.F.R. § 411.353]." 42 C.F.R. § 1003.102(b)(9).

331.   The Defendants have knowingly caused and retained overpayments from Federal Healthcare Programs arising from Defendants' violations of the Anti-Kickback Statute addressed above.

332.   By virtue of the Defendants' causing and retaining overpayments from the Medicare Program, the Medicaid Program, and other Federal Healthcare Programs, the United States

sustained damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

### Count VI---False Claims Act 31 U.S.C. 3729 (a)(1)(G) False Record to Avoid an Obligation to Refund

333.   Relators repeat the allegations and statements contained in all of the preceding paragraphs as though fully set forth herein.

334.   The False Claims Act also establishes liability for any person who "knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

335.    The Defendants knowingly made and used, or caused to be made or used, false records or false statements, i.e., the false certifications made or caused to be made by Defendants, to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

336.   By virtue of the false records or false statements made by the Defendants, the United States sustained damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

337.   Additionally, the United States is entitled to a civil penalty of between $5,500 and $11,000 for each false claim made or caused to be made by Defendants arising from their unlawful conduct as described herein.

### Prayers for Relief

338.   On behalf of the United States, Relators request and pray that judgment be entered against the Defendants in the amount of the United States' damages, trebled as required by law, such civil penalties as are required by law, for a qui tam relator's share as specified by 31 U.S.C. §3730(d),

for attorney's fees, costs and expenses as provided by 31 U.S.C. §3730(d), and for all such further legal and equitable relief as may be just and proper.

**JURY TRIAL IS HEREBY DEMANDED.**

Respectfully submitted, this the _____ day of October, 2016.

_____

Jeffrey H. Sloman
Florida Bar No. 378879
Stumphauzer & Sloman
Suntrust International Center
One SE Third Avenue, Suite 1820
Miami Florida 33131

**Lead Counsel**
Bryan A. Vroon, Esq. (*Pro Hac* Admission Motion to be filed)
Georgia Bar No. 729086
Law Offices of Bryan A. Vroon, LLC
1766 West Paces Ferry Road
Atlanta Georgia 30327
(404) 441-9806
bryanvroon@gmail.com

Edward D. Robertson, Jr. (*Pro Hac* Admission Motion to be filed)
Bartimus, Frickleton & Robertston
715 Swifts Highway
Jefferson City, MO. 65109
573-659-4454
chiprob@earthlink.net

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a copy of the within and foregoing Relators'

Complaint Under Federal False Claims Act by depositing a true and correct copy of same by

certified mail, signature receipt requested, addressed as follows:

The Honorable Attorney General Loretta E. Lynch
Attorney General of the United States
Attention: Seal Clerk
United States Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C.  20530-0001

The Honorable United States Attorney Wifredo A. Ferrer
Southern District of Florida
U.S. Attorney's Office
Attention: Civil Process Clerk
99 N.E. 4th Street
Miami, FL 33132

This ___11___ day of October, 2016.

For   Jeffrey H. Sloman